Of course, Judge Anderson and I were almost late because we're sitting back there reminiscing about good times in Macon. I'm sure Judge Pryor was fascinated by that, but welcome to the courtroom this morning. You all are experienced litigators. I know you are familiar with our lighting system, and so when the red light comes on, if you'd wind up your argument, that'd be great. And with that, I'll call the first case on the United States of America v. James Chapman. Ms. Hogue. Good morning. May it please the Court. We have been called here today to respond to a question posed by your Court, and this question has two parts. I'll begin with the first part, whether the district court's judicial notice that Cartersville, and I have to note an error in the question, it says Barrow County, but actually this is a Bartow County case, are within the Northern District of Georgia, whether that raises a legislative fact that's excluded from Rule 201, or whether it is an adjudicative fact. So I'll answer that portion of the question first. It is our position that venue is an adjudicative fact, and it is therefore subject to Rule 201. And I take that conclusion from the definition that's set forth in the advisory committee notes, 1972 proposed rules, that says this, that a legislative fact are those that have relevance to the legal reasoning and the lawmaking process. It's something that the judiciary must assess that has not been proven in order to engage in, and this is repeated in the commentary, judicial reasoning. And in order for a court to do its job, we must always make assumptions based on a high degree of indisputability about the definition of words and how we can begin to converse about what words mean in the courtroom. Otherwise, we're spending all of our time trying to define and redefine words that have no degree of disputability. So for example, a calendar, what day did that fall on? The witness can look at a calendar and say Wednesday. Whether the temperature is high, that means it would be hot out. It's the underlying agreement that we humans have about the definitions that are necessary to do our job. Those are legislative facts. Adjudicative facts are, as the advisory notes point out, simply the facts of a particular case. And the usual method of proving those, the accepted and necessary method of proving those is through evidence. Now . . . Doesn't our Bowers case itself control, though? It said that those facts, i.e. that Fort Benning was in the jurisdiction of the United States, which is very analogous to what happened here, that Bartow County and Cartersville are within the Northern District of Georgia. Yes, Your Honor. The decision in Bowers relies on the Eighth Circuit opinion in Gould. And the reason I take issue with Bowers and certainly its applicability to the Chapman case today, and why I say that it is incorrect and we should no longer be relying on that Fifth definition for legislative fact. They use this definition. Facts that do not change from case to case, but apply universally. And certainly the law, 28 U.S.C. Section 90, that sets out which counties belong to which judicial districts, don't change from case to case. I agree with that. Apply universally. I agree with that. But the problem is one of epistemology, the meaning of words, the origin of words, one that might . . . Even if Bowers is wrong, are we not bound by . . . No, I don't believe that you are, Judge Anderson, because I think there's a distinction and there's the ability certainly to overrule it and to make a decision that their use of The really important question, why anybody cares about this today, is whether taking judicial notice that the locus delectae, that the place where a crime has been proven to have occurred, whether it falls within the judicial territory, the jurisdictional territory of that court, infringes on the defendant's Sixth Amendment right to a trial by jury. We say that . . . What about . . . How do you respond to the fact that the statute itself, 28 U.S.C. 90 little a in paren, three in paren, and I'm quoting it, the Northern District of Georgia comprises four divisions, dot, dot, dot, three in paren. The Rome Division comprises of counties of Bartow and several others. Sixteen, I believe. Yeah, yeah. So that's actual legislation saying exactly what the district court said here. It is, Your Honor, but so is every statute. We don't assume that the court can take judicial notice that oxycodone is a Schedule I drug simply because the statute sets forth that it is. We make the government prove that. And how do we make them prove it? We make them present evidence, and then when they've presented sufficient evidence, we don't then allow the court to take judicial notice of that. We send that law back to the jury with an instruction. And it begs the question why that isn't the case here. In fact, the government did prove that these offenses through a witness took place in Cartersville, and the witness was allowed to testify that Cartersville falls within the Northern District of Georgia. So it begs the question why we allowed Judge Murphy to take judicial notice of that, even with the hedging instruction that he has to give that says, you know, I've just taken judicial notice of this, but if you disagree because you're the fact finder, you can do so. And as we point out in our briefs, Judge Murphy agrees. After the objection was made to that instruction, yeah, I can't imagine anybody would disagree with me on that. I assume that they'll just take it at my word because I'm Judge Murphy, and I'm sitting up on the bench. So why would we need judicial notice? Actually, does not that caveat that he gave that the Rule 201-F require? Doesn't that also as an alternative basis eliminate your problem? Two circuits at least have held that. I don't think we have held that yet. And I hope that you don't, Judge Anderson, because of exactly what happened, the colloquy in this case, and what we all know to be the truth. The jury is told from the beginning of the case when they take their first oath of voir dire that I'm the judge and I'll tell you what the law is, and you must follow my instructions. And then Judge Murphy concludes the case by saying this, the government has proven that Bartow County and Cartersville are within the Northern District of Georgia. Of course, you're the fact finders, and if you disagree, you can find otherwise. But I just told you that in fact they've met their burden of proof. Ms. Hogue, before we leave this topic, I just want to be sure I understood. I thought that I understood your brief to say, to object to the fact that the district court had told the jury that the Atlanta Medical Group was located in the Northern District of Georgia, but he did not do that. He did not. He said that the crime is alleged to have been committed in Cartersville and Bartow County. Now, leaving aside the fact that there really was not any proof that it was in Bartow County, simply that it was in Cartersville, the government did elicit from Agent Howard testimony that Cartersville is within the Northern District of Georgia. I wanted to ask you on another topic. What impact does this court's published opinion in Votrabeck, if I'm pronouncing that correctly, what impact does that have on your argument here with regard to the search? Well, I would, with regard to the search. The car stop and the validity of the affidavit. Well, Judge Martin, I would have to ask that you allow me to brief that separately. I really am not prepared to speak on that because I was called here on this one question. And perhaps I misunderstood, but it says to be prepared to discuss at oral argument this question. No, that doesn't mean you only have to talk about that. Then I misunderstood. And I'd be happy to brief that again and certainly do a supplemental brief with respect to how Votrabeck's opinion affected the search. Well, actually, that, of course, was a co-defendant. And all the same arguments were made. In other words, it was even the same motion was made. As I understand it, there were some pretrial matters that were consolidated. And the motion about the Franks hearing, which is what my sister is talking about, was joined by your client. And so your client joined all those same arguments. And, in fact, your brief makes exactly the same arguments that the briefs and Votrabeck made. So it seems pretty clear to me that you just foreclosed. You didn't look at that enough to know that. I really would be remiss for me to comment on that now. But I would be delighted to brief and do a supplemental brief on that issue, how Votrabeck's opinion affects the decision here in Chapman. While Votrabeck and Chapman were co-defendants, they were tried separately. It was a lengthy initial trial. But all of the arguments relevant to this Franks issue were actually the same arguments. You actually adopted those arguments. Yes, I believe that we did, Your Honor. But I have not commented, because of the ruling in Votrabeck, on how your decision would have impacted Mr. Chapman's case. I mean, as you know, they both challenged the same affidavit, so the same issues raised. All right. Thank you. All right. I have just a few seconds left before I have my response, and I don't want to waste a second. So I do just want to say, coming back to the question that the Court had noticed us about, the issue of whether this is an adjudicative or a legislative fact, I ask the Court to consider the notion that this is not a difficult burden of proof for the government. They simply have to ask a question, and they can prove it. And once they do it, it isn't necessary for the Court to take judicial notice after that. Thank you. Thank you. Good morning. Good morning. May it please the Court, my name is Laurel Boatwright, and it's my privilege to represent the United States in this matter before the Court this morning. Crucially, counsel for the appellant conceded in her opening remarks that, at the very least, venue is an adjudicative fact and therefore subject to Federal Rule of Evidence 201. The reason why that's a crucial concession is because if even under the appellant's argument, which the government, by the way, does not concede it's an adjudicative fact, but let's start there for purposes of where we are. If it is, in fact, an adjudicative fact that the Court took judicial notice of and Federal Rule of Evidence 201 applies, then a court is required to give a limiting instruction to the jury, informing them that they are free to disregard the instruction and arrive at their own conclusions, disregard what the Court has just said. That is, of course, the Court, Judge Murphy, instructed the jury that they were free to disregard the fact that he had taken judicial notice of the geographical locations of Cartersville and Bartow County and that they were located within the Congressional Federal District of the Northern District of Georgia. So even under appellant's argument, we don't have a problem here. There's no error, correct? But let's move back in time. Venue isn't actually an adjudicative fact. Excuse me. The facts that the Court gave judicial notice of here, of Cartersville, Georgia, and Bartow County, these are legislative facts. These are facts that are, one of which was actually the creation of a statute, 28 U.S.C. Section 90, which the Court helpfully provided to the parties. That's simply not something that's subject to dispute. That's the kind of fact that a court can take judicial notice of as a matter of law without having to instruct a jury that they can disregard. Similarly, although Cartersville, Georgia, being a city located within the confines of the Northern District of Georgia, does not appear in that same statute, it's the same sort of established truth that a court can take judicial notice of. And I think it's worth recognizing there's a good public policy reason why there are certain facts that courts can take judicial notice of without giving a limiting instruction to the jury. These are the kinds of facts that don't change from case to case because we don't want juries making different decisions in different cases about something like where is Cartersville, Georgia, located within congressionally determined districts. But again, even if the District Court got it wrong, even if this weren't a legislative fact and it weren't an adjudicative fact, the Court acted properly under Rule 201 by giving a limiting instruction. That disposes of the appellant's argument that the Court somehow directed a verdict on this question. The Court made it very clear that at the end of the day, it remained the jury's responsibility to take the information that the Court had provided, i.e., the geographical location of the city and the county, and apply it to the evidence that they had heard in this case, which is presumably what the jury did. We are required to assume that juries follow instructions when they're given. I forget which two circuits have held that, which two have held that. I believe, honestly, I don't recall right off the top of my head. I believe it's the Sixth Circuit, Your Honor, and possibly the Eighth Circuit. But please do not hold me to it. But even if it were error of some kind for the Court to have taken judicial notice — Sixth Circuit is held otherwise. No, not to my knowledge. And the appellant has not been able to direct this Court to any authority that endorses the appellant's view of this particular issue. Again, I think it's crucial to note, though, that even if there were somehow some error in what the district court did here, that is subject — jury instructions are subject to harmless error review, which is to say that this, even if it were error, which it was not, this Court would undertake to determine whether any factual — whether the particular fact was somehow contested. And if it were not contested, this Court would not be able to conclude that a defendant's constitutional rights had been impaired, even if the jury instruction in this case was improper. I thought this particular matter, i.e. taking an issue away — taking an issue about an element of a crime, I thought that was not subject to harmless error. So I would direct the Court's attention to the Drury case, which the government cited in its brief. It's 396 F. 3rd. 1303. It's a 2005 case. In that case — this is an Eleventh Circuit case published — the court there had provided an instruction to the jury that telephones were facilities in interstate commerce as a matter of law. And crucially, the Court did not give any sort of limiting instruction as to that fact. The Court simply took judicial notice and instructed the jury that an element of the particular offensive issue, which was whether or not the crime had affected interstate commerce, it took notice that telephones were facilities in interstate commerce. The Drury case makes clear that — I'm sorry, Judge. They didn't discuss it. In other words, it was treating jurisdiction different from other elements. No. The Drury case has nothing to do with venue or jurisdiction. The Drury case is, however, an example of — Well, it was the interstate commerce element, though, which is very similar to venue. In the sense that it's not an element of the offense that goes to the defendant's guilt or innocence. Right. It's not — and those are — those kinds of — Did the Drury case discuss that? Yes. The Drury case goes on to say that when there are certain kinds of errors, even constitutional errors, which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the federal Constitution, be deemed harmless. And then they go on to say, plainly, an instruction that omits an element of the offense, meaning, in this case, took it from the jury, from the province of the jury, that the error the defendant alleged there would be subject to harmless error analysis. What I think is important here is at the end of the day, the fact that Cartersville, Georgia and Bartow County were located within the Northern District of Georgia were unchallenged at trial. Agent Howard was not cross-examined on that fact. So that fact was uncontroverted. And under Drury, that means that there — that it was — that there was no reasonable doubt that the jury would have reached the same result as to venue with or without the judge's instruction. Ms. Boatwright. Yes. Judge Warren. I have some questions about other topics. In terms of the evidence against Dr. Chapman, I know he — they called it a salary that he received, but was — was the money that he received dependent at all from the drug sales of the clinic? So to — to answer the court's question, the evidence at trial showed that Dr. Chapman was paid a fixed salary and received additional money per additional patients that he saw in excess. Oh, I knew that. Of 30. Was it dependent at all on the drug sales? It was not dependent on the drug sales. If I can — that, however, is not determinative of whether or not Dr. Chapman — whether or not the government met its burden to prove that Dr. Chapman was aware of the illegal aims of the conspiracy at the clinic in AMG and willfully joined in that conspiracy. First of all, I think — I think that argument in appellant's — that with the element that the government's required to prove, which is whether Dr. Chapman knew the aims, the illegal aims of the conspiracy. The government argued in its closing at trial that Dr. Chapman likely had multiple motives for why he was willing to exploit his medical license in this fashion for — for over a year. One was, in fact, money that he was receiving — received approximately $300,000 over the course of his time there, which was more than physicians in his position were receiving. But in addition, he was motivated by the fact that he had access to drugs to support his own addiction and also — and also, frankly, that — that he was a — he was a doctor who had fallen from grace and was — was motivated by his ego to be able to get back into the business and could sort of be king of his castle at a clinic like this. But to specific — to respond — to take the court's question a bit further, it's not required that — the government's not required to show that a defendant somehow shared in the ill-gotten gains of a conspiracy. And here, to the extent that the government charged that the purpose of the conspiracy was to sell as many pills as possible, Dr. Chapman engaged in numerous acts to further that aim of that conspiracy. As the court knows, an agreement to join a conspiracy can be inferred from performing acts that further its aims. And here, there would have been no pills to be sold were it not for Dr. Chapman using his DEA registration number and signing DEA 222 forms for the — over the course of an entire year and submitting false applications under penalty of perjury that were providing facts to drug supply companies to make it look like this place was more legitimate than it actually was. Wouldn't — wouldn't AMG have used Chapman's DEA registration number to order drugs, even if it were a legitimate operation? That's — that's correct. The — well, he — AMG was not entitled to order drugs. Dr. — the law is that that is Dr. Chapman's DEA registration number, and Dr. Chapman was responsible for it. And Dr. Chapman was supposed to be responsible for both the purchasing of controlled substances and supervising the dispensing of those controlled substances. So while it's the case that those pills could have been purchased in the — as part of the clinic's operations, the fact that they were purchased fraudulently pursuant to false representations that were made by Dr. Chapman himself renders both the original purchase from the drug supply companies as illegal, as well as their ultimate dispensing at the clinic. Do you — what — what do you have to say about the court's ruling in Votravac? I mean, how does that impact what we do here? The — the court in — in the Votravac case, the — the panel is exactly right. Judge Anderson is exactly right. Appellant joined in the motion in the lower court, thus identical issues were raised in the district court level. Similarly, appellant's brief here raises exactly the same arguments at the appellate level. Therefore, the government respectfully submits that supplemental briefing is not necessary here. There was compelling — and rests, frankly, on the arguments that we made in the Votravac case that — that the — that the showing that the court did not abuse its discretion in refusing to have a Franks v. Delaware hearing. I would also note that because appellant adopted all the same arguments at every single stage of review, appellant here failed to address the point that even if some of the allegedly false statements in the agent's affidavit were struck, there was still sufficient probable cause — there were still sufficient facts alleged to have found probable cause. Appellant did not raise that in the initial brief, and therefore it's waived before this court, just like the defendants in the other case did not raise that issue before the Votravac panel. I have another question. I'm just curious. The first trial ended in a hung jury, right? The first trial of Dr. Chapman, yes. It was — it ended as a mistrial. Do you — do you view this as a close case? Absolutely not. That was a softball, I guess. Yes, ma'am. I guess you just never know what a jury's going to — To the court's point, in light of the mistrial, the government significantly retooled the way we presented the case and made sure that the jury only heard evidence that was directly implicating Dr. Chapman and his direct knowledge of the illegal activities at the clinic. So we respectfully believe that we narrowed potential targets for distraction, and the second jury was therefore able to focus on what was evident. Let me ask you another question about that evidence. How did the fact that Dr. Chapman was drunk when he was prescribing the substances, how was that relevant to his knowledge or intent to participate in the conspiracy? Certainly. The fact that Dr. Chapman was drinking alcohol during work hours while prescribing controlled substances at this clinic is relevant because the only real issue at trial in this case was whether he was prescribing controlled substances within the usual course of professional practice. It was uncontested at trial that it's outside the course of usual professional medical practice for doctors to be consuming liquor while they're prescribing highly addictive hospice-level quantities of controlled substances. Also significantly, the government — it dovetailed with the mountain of other evidence that the government had that he was also abusing controlled substances of his own. And I direct the court's attention to the five days in April 2011 when he agreed to the co-conspirators illegally procuring Lorset Hydrocodone for him. Then he wrote a prescription to someone else in someone else's name that he knew he would consume himself. He then consumed those pills, and he then proceeded to prescribe to 21 different patients while he was high as a kite and incapable of even writing his name. So the fact that he was drinking and during the time frame of the conspiracy is significant. I'd also just — I'm sorry, Judge Martin, did you have a further question? Well, I was just thinking about, you know, many decades ago now, I represent the medical board, and it just seems mysterious to me that a doctor in this situation wouldn't have come to the attention of the medical board before he, you know, got into criminal problems. I've run out of time, but would the court like for me to respond? Yeah, I guess if you know the answer. In this case, the evidence shows that the medical board was immediately aware of Dr. Chapman and everything that was problematic of his activities at that clinic. They began investigating him early in 2010, and they put their investigation on hold because the evidence of there in fact being a criminal conspiracy was so significant they did not want to compromise the ongoing law enforcement investigation. Thank you. Thank you. Well, you have drugged me into this more interesting area, and I do want to comment on that. There was a mistrial the first time around with Dr. Chapman, and the jury was interviewed by all of us. And what the jury made clear was that Dr. Chapman obviously was impaired, and they believed that he had easily been manipulated by drug-abusing and drug-diverting patients, and that his impairment made it nearly impossible for him to have engaged in any knowing involuntary conspiracy with the other folks that were running the clinic. He was just doing a bad job at being a pain management physician. In fact, the medical board was aware of him early on, and one enormous piece of evidence in the trial that was cross-examined heavily and argued completely in closing argument was that the agent called the medical board early on and told them to, and I quote, stand down, the military term, stand down. In other words, get below us so we can do our for two more years so that the government would have a case to prosecute. And that was really a focus of the first and the second trial. I want to use the last minute and a half for the much less interesting portion. I didn't, I don't recall in your brief that you made an argument that, in effect, he was innocent because he was impaired and could not form the intent. No, and I apologize if I've misstated that, Judge Anderson. I was answering Judge Martin's question as to, Ms. Curiosity, why it was that we thought the first case resulted in a mistrial. They believe not that he was impaired and couldn't have made those decisions, and I shouldn't have said it that way. What they concluded was, from watching the video and hearing the witnesses at trial, and quite honestly, watching the man during trial, that he was so impaired and so unfocused that the notion that he would engage in a conspiracy to plan out, hear what it was that these clinic runners wanted him to do and follow their instructions, that was just way more than he was capable of taking on. What he did is just what Ms. Boatwright said. He found a job that he was able to do, according to the clinic owners, and he did it, but he did it very poorly and to the detriment of many patients. But the notion of engaging in a conspiracy to distribute drugs as a drug dealer would was simply beyond the ken, they believed, of what he could have accomplished, given his state of mind. Thank you, Ms. Hoyer. Thank you. Thank you. I'll call the case of Melinda.